UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Leslie Luster,

                Plaintiff,

v.

Wells Fargo Bank, N.A.,

                Defendant.

Civil No. 10-3676 SRN/FLN

**MEMORANDUM OPINION AND ORDER**

_____

Mark E. Dooley, Esq., Neaton & Puklich, PLLP, Chanhassen, MN, on behalf of Plaintiff.

David A. James, Esq., and Joseph G. Schmitt, Esq., Nilan Johnson Lewis PA, Minneapolis, MN, on behalf of Defendant.

_____

SUSAN RICHARD NELSON, United States District Judge

Before the Court is Defendant Wells Fargo Bank, N.A.'s ("Wells Fargo") Motion for Summary Judgment [Docket No. 12]. For the reasons stated below, Defendant's Motion is granted.

## I.   BACKGROUND

Plaintiff Leslie Luster ("Luster") started working as a consumer loan underwriter with Wells Fargo on October 19, 2009. (Notice of Removal [Docket No. 1] Ex. 1 ("Compl.") ¶ 3.) At all relevant times, Matt McDevitt ("McDevitt") was Luster's supervisor. (James Aff. [Docket No. 14] Ex. L ("Luster Dep.") 134:22–136:5.)

As part of Wells Fargo's bonding requirements under FDIC regulations, Wells Fargo is prohibited from employing anyone who has "committed in fact an act of breach of trust or dishonesty . . . [a]gainst any Wells Fargo company at any time." (James Aff. Ex. A.) Check kiting — where an individual writes a check with insufficient funds to cover the check, and then

deposits funds from another account to cover the check before it overdraws the account — is a dishonest act which renders the actor unbondable. (Luster Dep. 151:20-22, 153:7-11; Compl. ¶ 8.) To maintain its fidelity bond, Wells Fargo terminates individuals who have engaged in check kiting. (Compl. ¶ 8; James Aff. Ex. A.) Luster's offer letter, as well as the Code of Ethics and Business Conduct, informed her that check kiting might result in immediate termination from Wells Fargo, and Luster specifically acknowledges that she understood this policy. (James Aff. Ex. B. at 106; Luster Dep. 147:25-148:22, 150:6-10.)

   While employed by Wells Fargo, Luster and her husband, Antwan Luster, kept Wells Fargo checking accounts. (Luster Dep. 23:10-13, 24:9-16; James Aff. Exs. E, F.) Most of Luster's paychecks were direct-deposited into Antwan Luster's checking account, and his account was used to pay joint bills, as well as some of Luster's individual obligations. (Luster Dep. 25:1-27:13, 32:19-33:3.) Antwan Luster's account lacked overdraft protections and could incur overdraft fees. (Id. 33:19-36:15.) On December 17, 2009, Antwan Luster spent $484.89 from his checking account, although his daily ending balance the day before was only $483.21. (James Aff. Ex. F.) The account would have been overdrawn and resulted in an overdraft fee except for a $20.00 check written from Luster's checking account to Antwan Luster's checking account that day. (Id.; Luster Dep. 52:19-53:9) When Luster wrote and deposited the $20.00 check from her account to her husband Antwan Luster's account, her account balance was $9.29. (James Aff. Ex. E.) Before the check cleared and the money withdrawn from her account, Luster deposited a check from Antwan Luster's account to her own account for $50.00. (James Aff. Exs. I, J.) As a result, neither account was charged an overdraft fee. (See James Aff. Exs. F, I, J.)

Wells Fargo maintains a computer-generated Internal Fraud Detection Unit which monitors employee accounts for misconduct, including suspicious deposits between Wells Fargo accounts.  (Millard Aff. [Docket No. 15] ¶ 2.)  Luster's account was flagged by the Internal Fraud Detection Unit, and Wells Fargo Investigator Jodie Millard ("Millard") was assigned to investigate.  (Id. ¶¶ 1–2.)  Millard's investigation revealed the back-to-back checks to prevent overdrafts in both accounts, and she determined that, based on Luster's online banking activity, she knew her account had less than $20.00 when she wrote the $20.00 check to Antwan Luster.  (Id. ¶¶ 3, 5.)  Millard asked McDevitt to arrange a conference call with Luster to discuss these activities.  (Id. ¶ 5.)

On January 13, 2010, Luster participated in a conference call with McDevitt and Luster.  (Id. ¶ 6.)  During the conference call, Luster signed an acknowledgment that she was the subject of a formal investigation.  (Luster Dep. 78:23-79:8.)  Millard asked Luster about her checking activity, centering particularly on December 17 and 18, 2009.  (Millard Aff. ¶ 6.)  Luster explained that the check written on insufficient funds was a simple oversight.  (Compl. ¶ 9.)  Millard then asked Luster to write a statement about the incident.  (Millard Aff. ¶ 6; Luster Dep. 88:23-89:6.)  Luster's statement addressed the $20.00 check but not the $50.00 check.  (Luster Dep. 90:1-17.)  Following the conference call, Millard concluded that Luster had engaged in check kiting, was therefore unbondable, and recommended that Wells Fargo terminate her.  (Millard Aff. ¶ 7.)  McDevitt and employee relations consultant Laurie Bush accepted the recommendation and terminated Luster on January 13, 2010.  (Id.; Compl. ¶ 11.)  On August 23, 2010, Luster filed her Complaint in this suit.

**III. DISCUSSION**

    **A. Standard of Review**

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. Ludwig, 54 F.3d at 470. The nonmoving party, however, may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

    **B. Luster has Failed to Establish a Racial Discrimination Claim against Defendant**

Luster alleges that Wells Fargo engaged in racial discrimination in its determination to terminate her employment, in violation of the Minnesota Human Rights Act ("MHRA).[1] Minnesota Statute § 363A.08 provides in part that, "Except when based on a bona fide occupational qualification, it is an unfair employment practice for an employer, because of race . . . [to] (2) discharge an employee. . . ." Minn. Stat. § 363A.08, subd. 2. When a plaintiff can establish direct evidence of discriminatory intent — evidence of conduct or statements that show a specific link between the employment decision and some discriminatory animus — then the

---

[1] Luster's Complaint also includes facts alleging that she inquired about advancement within Wells Fargo, that she "observed a pattern of discrimination in advancement for African American employees," and that "[h]igher positions are open to application, but African American employees are denied opportunities to take the requisite tests for advancement." (Compl. ¶¶ 4, 6, 7.) However, Luster's sole claim is that her employment termination was based in part on racial discrimination in violation of Minn. Stat. § 363A.08. (Compl. ¶¶ 16–17.) Accordingly, this summary judgment order focuses only on the facts material to Luster's termination.

inference is that the discriminatory attitude more likely than not was the motivating factor. See Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P., 444 F.3d 961, 966 (8th Cir. 2006). Luster has alleged no direct evidence of discriminatory intent — in fact, she has specifically stated that she has no first-hand or second-hand knowledge of either McDevitt nor Millard making any race-based comments to her or about her. (Luster Dep. 180:23–181:19.) Additionally, Luster concedes that she has no direct evidence of discrimination. (See Pl.'s Mem. in Opp. to Def's Mot. For Summ. J. [Docket No. 18] ("Pl.'s Mem.") 4.)

Absent a showing of direct evidence of racial discrimination, courts apply the McDonnell Douglas test, set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Fields v. Shelter Mut. Ins. Co., 520 F.3d 859, 863–64 (8th Cir. 2008) (applying the McDonnell Douglas framework to a racial discrimination claim); Martinez v. W.W. Grainger, Inc., 664 F.3d 225, 229–30 (8th Cir. 2011) (applying McDonnell Douglas burden-shifting analysis to an MHRA claim of racial discrimination). The McDonnell Douglas framework requires that an employee meet the initial burden of establishing a prima facie case of discrimination, after which the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its action. McGinnis v. Union Pacific R.R., 496 F.3d 868, 873 (8th Cir. 2007). After the employer meets its burden of production, then the employee must establish by a preponderance of the evidence that the employer's articulated reasons are pretextual. Id.

### 1. Luster Cannot Establish a Prima Facie Case of Discrimination

To establish a prima facie case of discrimination, a plaintiff must demonstrate the following: (1) that she is a member of a protected class; (2) that she was meeting her employer's legitimate job expectations; (3) that she suffered an adverse employment action; and (4) the

circumstances give rise to an inference of discrimination (i.e. that similarly situated employees outside the protected class were treated differently).  Fields, 520 F.3d at 874.  Here, the parties agree that the first three elements have been established and that only the fourth element is at issue — whether the alleged facts surrounding Luster's termination give rise to an inference of discrimination.  (See Def.'s Mem. for Summ. J. [Docket No. 13] 11; Pl.'s Mem. 6. )

When the decision-maker responsible for the adverse employment action did not know at the time that the plaintiff was a member of a protected class, no prima facie case of discrimination can be established.  See, e.g., Raytheon Co. v. Hernandez, 540 U.S. 44, 55 n.7 (2003) ("If [the decision-maker] were truly unaware that such a disability existed, it would be impossible for her hiring decision to have been based, even in part, on respondent's disability."); Hammer v. Ashcroft, 383 F.3d 722, 727 (8th Cir. 2004) (finding summary judgment appropriate where decision-maker's sworn declaration that he did not know the plaintiff's protected status was uncontroverted); Buettner v. Eastern Arch Coal Sales, Co., 216 F.3d 707, 715 (8th Cir. 2000) ("A plaintiff must show the employer had actual or constructive knowledge of the [plaintiff's protected status] in order to establish a prima facie case . . . .").

Although Luster contends that the circumstances of her termination create the inference of racial discrimination, her arguments are unavailing because the decision-maker Millard did not know her race and because she has offered no evidence inferring racial discrimination against her.  It is undisputed that Millard never met Luster and did not know her race.  (See Luster Dep. 180:23-24.)  The January 13, 2010 conference was conducted over the phone, and Luster never had a face-to-face meeting with Millard.  Since Millard, the decision-maker who recommended Luster's termination, never knew Luster's race, Luster cannot establish a prima

6

facie case of discrimination.  See Buettner, 216 F.3d at 715.

Luster also has offered no evidence inferring racial discrimination against her.  Luster knew of no racially discriminatory comments, either personally or second-hand, made by the decision-maker Millard in this case.  (Luster Dep. 180:19-181:19.)  Furthermore, Luster knew of no discriminatory comments made by her supervisor, McDevitt.  (Id.)  Concerning the circumstances of her termination, Luster has offered no evidence suggesting racial discrimination on the part of the decision-maker.  Due to this lack of evidence, Luster has failed to establish a prima facie case of discrimination.

## 2. Luster Cannot Show Wells Fargo's Reasons were Pretextual

Even if Luster had established a prima facie case of discrimination, Wells Fargo has offered a legitimate reason for terminating Luster — namely, that its internal investigation determined she had engaged in check kiting and was therefore unbondable.  Luster herself agrees that the results of Wells Fargo's investigation, "if true, would supply a legitimate reason for termination . . .[and] Ms. Luster's denial of advancement opportunities and her termination related to her request to do so would be moot."  (Pl.'s Mem. 7.)

Luster argues, however, that Wells Fargo's stated reason for terminating her is pretext and that the real reason for the investigation and the termination was racial discrimination.  Once an employer has established a legitimate, nondiscriminatory reason for termination, the plaintiff bears the burden of showing pretext.  Wierman v. Casey's Gen. Stores, 638 F.3d 984, 996 (8th Cir. 2011).  To rebut a legitimate reason, the plaintiff must identify "enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive, even if that evidence [does] not directly contradict or disprove [the] defendant's articulated reasons for its actions."  Id.

(quoting Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 945 n.8 (8th Cir. 1994)). A plaintiff can directly establish pretext "by persuading the court that a discriminatory reason more likely motivated the employer," or she can indirectly prove pretext by "showing that the employer's proffered explanation is unworthy of credence." Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).

Courts will not "sit as super-personnel departments reviewing the wisdom or the fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." Girten v. McRentals, Inc., 337 F.3d 979, 982–83 (8th Cir. 2003) (citation omitted). As long as the employer's reason for termination is not discriminatory, the soundness or correctness of the reason is irrelevant. See Macias Soto v. Core-Mark Int'l, Inc., 521 F.3d 837, 842 (8th Cir. 2008) ("In determining whether a plaintiff has produced sufficient evidence of pretext, the key question is not whether the stated basis for termination actually occurred, but whether the defendant believed it to have occurred."); Hill v. Harsco Corp., 356 F.3d 920, 924 (8th Cir. 2004) ("The key question in a discrimination case like this one is not whether [the plaintiff] was truly fighting, but whether the employer really *believed* that he was fighting, such that the termination was based on a non-discriminatory reason.").

Although Luster alleges she received disparate treatment, she has failed to provide evidentiary support for this and has not identified similarly situated individuals who received different employment outcomes. Luster's Complaint ostensibly states that "on several occasions, [she] has witnessed non-African American Wells Fargo employees draft insufficient funds checks [and t]hese individuals were not terminated." (Compl. ¶ 12.) Luster, however, has failed to show any evidence or name any specific similarly situated individuals to support this

8

contention. In her deposition, Luster stated that she had second-hand knowledge of an anonymous woman who overdrafted her Wells Fargo account, was delinquent in mortgage payments, and was not terminated from her employment. (Luster Dep. 175:24-176:18, 179:13-16.) Disparate treatment is not probative of pretext when the plaintiff has failed to "identif[y] any specific individual who received preferential treatment or otherwise provide[] sufficient detail that would permit [the court] to determine whether these individuals were in fact similarly situated to him." Anderson v. Durham D & M, L.L.C., 606 F.3d 513, 521 (8th Cir. 2010). Here, Luster's failure to specify similarly situated individuals and failure to show that she was similarly situated to better treated employees in "all relevant respects" fails to meet the rigorous standard required to establish pretext. Id. (quoting Wimbly v. Cashion, 588 F.3d 959, 962) (8th Cir. 2009)). Additionally, the evidence regarding this anonymous woman is inadmissible hearsay, and as such cannot be used to defeat summary judgment. Tuttle v. Lorillard Tobacco Co., 377 F.3d 917, 923 (8th Cir. 2004) (finding hearsay evidence insufficient to avoid summary judgment). Furthermore, Luster has not provided sufficient evidence to show that the anonymous woman was similarly situated.

For disparate treatment analysis, a similarly situated individual used for comparison "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000). Luster's threadbare claims about "non-African American Wells Fargo employees draft[ing] insufficient funds checks" and an unknown woman's alleged writing of checks backed by insufficient funds do not establish that Luster is similarly situated to them. (See Compl. ¶ 12; Luster Dep. 176:4-177:4.) Further, Luster has specifically stated that

the anonymous woman had a different supervisor, see Luster Dep. 176:24-177:8, making her not similarly situated. For all these reasons, Luster has not proven pretext and summary judgment is warranted.

Moreover, although Luster disagrees with Wells Fargo's conclusion that she engaged in check kiting, she has not offered a scintilla of evidence to infer another reason for her termination. The investigation was triggered when the Internal Fraud Detection Unit noticed suspicious checking activity between Wells Fargo accounts. (Millard Aff. ¶ 2.) The fraud investigator Millard never knew Luster's race, and the recommendation for Luster's termination came from her. (Id. ¶¶ 7–8.) Luster's immediate boss, McDevitt, simply agreed that, based on the results of the investigation and Wells Fargo policy, Luster should be terminated. (Id. ¶ 7.) Luster has not provided sufficient admissible evidence to raise genuine doubt as to Wells Fargo's motive, nor has she shown that their proffered explanation is unworthy of belief.

Luster points to apparent inconsistencies in Millard's and McDevitt's recollections of the January 13, 2010 phone conference as evidence of a genuine material fact in dispute. Specifically, Luster points out that while McDevitt stated Luster was "noncommital as far as the knowledge that the account did not have sufficient funds at the time the check was written," Dooley Aff. [Docket No. 19] Ex. 5, Millard's notes from the January 13, 2010 conference indicate that Luster gave Antwon Luster the money, "knowing that she would be able to put money back in the account before the check would clear," id. Ex. 4. Any inconsistencies between these memories, though, are not material. Based on the phone conference and the results of the investigation, and without knowledge of Luster's race, Millard recommended Luster be terminated. Without more, the alleged inconsistencies between Millard's and

10

McDevitt's memories are innocent errors on a peripheral matter. Because no genuine issues of material fact are in dispute, summary judgment is warranted.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment [Docket No. 12] is **GRANTED**; and

2. Luster's Complaint [Docket No. 1] is **DISMISSED with prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: April 20, 2012

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge